# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| **HELEN KINCHELOE, ET AL.** | § | |
| | § | |
| **V.** | § | **CAUSE NO. A-09-CA-010 LY** |
| | § | |
| **DAVID CAUDLE INDIVIDUALLY and** | § | |
| **IN HIS OFFICIAL CAPACITY AS** | § | |
| **POLICE CHIEF OF BERTRAM, ET AL.** | § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

TO:     THE HONORABLE LEE YEAKEL
        UNITED STATES DISTRICT JUDGE

Before the Court are: Defendants' Motion for Judgment on the Pleadings (Clerk's Doc. No. 10); David Chief Caudle's Motion for Summary Judgment (Clerk's Docket No. 19); JoAnn Stephens' Motion for Summary Judgment (Clerk's Docket No. 20); and the Parties' Response and Reply Briefs. The Magistrate Court submits this Report and Recommendation to the United States District Court pursuant to 28 U.S.C. § 636(b), Federal Rule of Civil Procedure 72, and Rule 1(d) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges. Having reviewed the Motions, Responses, Replies, the entire case file, and the applicable law, the Court enters the following Report and Recommendation.

## I.  GENERAL BACKGROUND

Plaintiffs Helen Kincheloe, David Kincheloe, William Bell, David Thomas, Melinda Copeland, Kristen Bergeson, and L.O. Pogue ("Plaintiffs")—all residents of Bertram, Texas—filed this civil rights suit under 42 U.S.C. §1983 against the City of Bertram, its Mayor and its Chief of Police, after allegedly suffering civil rights violations at the hands of Bertram's Police Chief. Plaintiffs first allege that on the morning of August 25, 2008, Chief David Caudle, Police Chief of

Bertram, Texas ("Chief Caudle"), was driving down Helen Kincheloe's street in his patrol car when he spotted Ms. Kincheloe's pet dog "Buddy" walking down the street. Chief Caudle avers that after he spotted Buddy, he rolled down his window of his car and "yelled at the dog" because—according to Chief Caudle—Buddy was a pit bull and was not wearing a collar. Apparently, Buddy ignored Chief Caudle's yelling and proceeded to walk back to the front yard of his house. Chief Caudle contends that he then drove alongside the dog as it returned to the Kincheloe's residence, walked up to the porch and began to bark at Chief Caudle. After parking his patrol car in the middle of the street in front of the Kincheloe's house, Chief Caudle walked toward Buddy. After observing a police car in front of her house, Ms. Kincheloe's granddaughter, Crystal Clark, walked outside to see what was going on. When Ms. Clark walked outside, she saw Buddy sitting in the front yard and proceeded to call out to Buddy. Unfortunately, Buddy did not respond to Ms. Clark's calls and proceeded to walk toward some bushes on the front lawn of the house. Before Ms. Clark was able to call out for Buddy again, Chief Caudle pulled out his gun and fired two shots at Buddy, striking him in the head and killing him. Plaintiffs contend that Crystal was standing in close proximity to Buddy when Chief Caudle fired the shots. After hearing the gun shots, Helen Kincheloe's son, James Kincheloe, came out of the house to see what was going on. Upon seeing James, Chief Caudle yelled "If you come at me, I'll shoot you also!"

Plaintiffs contend that Buddy was known in the neighborhood as a "peaceful dog" who had never exhibited any aggressive behavior towards anyone. In contrast, Chief Caudle claims that he followed Buddy to the Kincheloe's residence because he was concerned that Buddy, a pit bull, was out loose and roaming the neighborhood. Chief Caudle further claims that he shot Buddy because Buddy was exhibiting aggressive behavior and that he was acting in self-defense since Buddy had charged him (a contention the Kincheloes strongly dispute).

Plaintiffs further complain about another incident involving Chief Caudle, which occurred on August 17, 2008. On that date, Plaintiff William Bell ("Bell") was at his house with his minor son and his son's friend, J.F., who was spending the night at Bell's house. Bell contends that at approximately 2:30 a.m., J.F.'s father called to warn Bell that the father's estranged wife (and J.F.'s mother), was on her way to Bell's house to pick up J.F. The father told Bell that he should not give J.F. to the mother because "she had just been carried out of the bar and was too drunk to safely take J.F. home." Bell Affidavit at 1. Shortly after this telephone call, the mother arrived at Bell's house and according to Bell "appeared to be very drunk." *Id.* Bell informed the mother that he would not give J.F. to her because she was drunk and that he was concerned with J.F.'s well-being. After the mother began to yell and holler in his front lawn, Bell called 911. The 911 dispatcher told Bell to wait for a police officer to arrive at the scene.

A few minutes later, Chief Caudle arrived at Bell's house and stopped in the front yard to talk to the mother for a few minutes. Bell alleges that Chief Caudle then approached Bell and informed him that if he did not give J.F. to the mother, he would "send me to jail for kidnaping." Bell Affidavit at p. 2. Bell avers that he attempted to explain to Chief Caudle that the mother was intoxicated, but that Chief Caudle refused to listen to his explanation. Bell alleges that Chief Caudle then asked Bell to bring the child to Chief Caudle and attempted to enter Bell's home, but that Bell told Chief Caudle that he did not want him to enter his home and scare the children. Bell Affidavit at p. 2. After Bell went inside his house to wake J.F., he alleges that Chief Caudle kicked open his front door and charged into his home while "reaching for his gun" and "yelling that I was not obeying his orders." Bell Affidavit at p. 2. Bell, who was still on the phone with the 911 dispatcher, then asked the 911 dispatcher to send over another officer to get Chief Caudle out of his house. Bell further contends that before Chief Caudle left his house, Chief Caudle threatened to dispatch Child

Protective Services ("CPS") to remove Bell's son from the house. Bell further alleges that after he informed Chief Caudle that he had been on the phone with 911 the entire time, Chief Caudle ripped the phone out of his hands, terminated the call and threw the phone on the front porch. Lastly, Bell alleges that a couple of weeks after the above-incident, Chief Caudle ran into Bell at a car wash and again threatened to dispatch CPS to take Bell's son away from him.

In addition to these incidents, Plaintiffs allege that Chief Caudle was involved in several other documented situations in which he abused his power as the Police Chief of Bertram, Texas. For example, Plaintiffs allege that in January 2008, after Chief Caudle ran a red light and hit a car driven by a pregnant woman, he attempted to discourage those at the scene from notifying EMS or the Department of Public Safety. Plaintiffs also point to an incident in February 2008, in which Chief Caudle allegedly pointed a loaded handgun at the head of another police officer while they were in front of a computer at police headquarters. Finally, Plaintiffs allege that in November 2007, Chief Caudle mishandled vital evidence in a drug seizure and threw some of the evidence in the trash.[1]

After receiving several complaints regarding Chief Caudle's behavior, on May 21, 2008, Plaintiff L.O. Pogue, Mayor Pro Tem of Bertram ("Pogue"), informed Chief Caudle that he was not happy with the way Chief Caudle was running the police department and told him that he would not support a merit raise for him. At his request, Chief Caudle met with Pogue and JoAnn Stephens, Mayor of Bertram, on June 9, 2008. At the meeting, Chief Caudle read several pages of charges he said he would file against Pogue and threatened to send Pogue to prison for 40 years. On June 10,

---

[1]Plaintiffs also allege that Chief Caudle has a history of abusing his power and using excessive force while he was a jailer in the Travis County Sheriff's Department from 1988 through 2002. Plaintiffs point out that Travis County fired Chief Caudle in 2002 after he was accused of grabbing an inmate by the testicles and penis.

4

2008, Pogue complained to the Bertram City Council regarding the incident with Chief Caudle and read a letter he wrote regarding the incident. Although he requested that the letter be placed in Chief Caudle's personnel file, the City Secretary refused to do so, claiming that the letter had not been properly initiated under the Texas Government Code. Plaintiffs also allege that Mayor Stephens refused to accept a signed petition from various Bertram citizens, including Plaintiffs, calling for the firing of Chief Caudle.

Plaintiffs further allege that Pogue has repeatedly expressed his concerns to the Bertram City Attorney that the City Council, Mayor and Police Chief may have been involved in fraudulent and illegal activities. Despite these allegations, Plaintiffs contend that Mayor Stephens has refused to allow Pogue to speak to the City Attorney about these matters. In addition, Pogue alleges that Mayor Stephens and Chief Caudle have retaliated against him for his criticism by pushing for his resignation.

Based upon the foregoing, on January 8, 2009, Plaintiffs Helen Kincheloe, David Kincheloe, William Bell, David Thomas, Melinda Copeland, Kristen Bergeson, and L.O. Pogue, individually and in his official capacity as Mayor Pro Tem of Bertram, ("Plaintiffs") filed the instant civil rights lawsuit under 42 U.S.C. §1983 against David Chief Caudle, individually and in his official capacity as Police Chief of Bertram, Texas, JoAnn Stephens, individually and in her official capacity as Mayor of Bertram, Texas and the City of Bertram, Texas ("Defendants"). The Complaint alleges that Chief Caudle's actions with regard to the killing of the Kincheloe's dog deprived Plaintiffs Helen and David Kincheloe of their right to be free from unreasonable searches and seizures under the Fourth Amendment, to be free from the use of excessive force, and has deprived them of their property. Plaintiffs also claim that Chief Caudle's actions with regard to William Bell violated Bell's right to be free from unreasonable searches and seizures and excessive force under the Fourth

Amendment. Plaintiffs raise intentional infliction of emotional distress and assault claims under Texas law. Plaintiffs further allege that the Mayor and the City's refusal to hear a petition to remove Chief Caudle as Police Chief violated Plaintiffs' rights to free speech under the First Amendment and violated their free speech rights under the Texas Bill of Rights. Lastly, Plaintiffs allege that Mayor Stephens retaliated against Pogue for criticizing Chief Caudle, in violation of Pogue's First Amendment rights.

Defendants have now filed a Rule 12(c) Motion for Judgment on the Pleadings (Clerk's Doc. No. 10), arguing that Plaintiffs have failed to allege viable federal and state claims against Defendants. In addition, Caudle has filed his own Motion for Summary Judgment in his Individual Capacity (Clerk's Docket No. 19), arguing that he is entitled to judgment as a matter of law on the basis of qualified and/or official immunity. Defendant JoAnn Stephens has also filed a Motion for Summary Judgment in her Individual Capacity (Clerk's Docket No. 20), also contending that she is entitled to judgment as a matter of law on the basis of qualified and/or official immunity. The Court will now determine whether Plaintiffs have alleged sufficient factual allegations to withstand the above motions.

## II. STANDARD OF REVIEW

### A. Federal Rule of Civil Procedure 12(c)

A motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6). *Doe v. MySpace, Inc.,* 528 F.3d 413, 418 (5th Cir.), *cert. denied*, 129 S.Ct. 600 (2008). "[T]he central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief." *Id.* (citing *Hughes v. The Tobacco Inst., Inc.*, 278 F.3d 417, 420 (5th Cir. 2001)). Although the Court must accept the factual allegations in the pleadings as true, a plaintiff must plead "enough facts to state a claim to relief that is plausible on

its face." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). A motion to dismiss under Rule 12(b)(6) is "viewed with disfavor and rarely granted." *Kaiser Alum. & Chem. Slas v. Avondale Shipyards*, 677 F.2d 1045, 1050 (5th Cir. 1982), *cert. denied*, 459 U.S. 1105 (1983).

**B.      Federal Rule of Civil Procedure 56(c)**

_____Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Ragas*, 136 F.3d at 458. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary-judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary-judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not

competent summary-judgment evidence.  *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

The party opposing summary judgment is required to identify specific evidence in the record and to

articulate the precise manner in which that evidence supports his claim.  *Ragas*, 136 F.3d at 458.

Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to

support the nonmovant's opposition to the motion for summary judgment.  *Id.*; *see also Skotak v.

Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992).  "Only disputes over facts that

might affect the outcome of the suit under the governing laws will properly preclude the entry of

summary judgment."  *Anderson*, 477 U.S. at 248.  Disputed fact issues which are "irrelevant and

unnecessary" will not be considered by a court in ruling on a summary judgment motion.  *Id.*  If the

nonmoving party fails to make a showing sufficient to establish the existence of an element essential

to its case and on which it will bear the burden of proof at trial, summary judgment must be granted.

*Celotex*, 477 U.S. at 322-23.    Keeping the foregoing standards of review in mind, the Court will now

determine whether Plaintiffs have alleged sufficient facts to support their claims in this case.

## III.  ANALYSIS

### A.    Section 1983 claims against the Individual Defendants

Plaintiffs have brought the instant lawsuit under 42 U.S.C. § 1983 alleging that their

constitutional rights were violated by the actions of the Defendants.  Section 1983 provides a private

cause of action against those who, under color of law, deprive a citizen of the United States of "any

rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.  A

plaintiff may bring a claim under § 1983 against persons in their individual or official capacity, or

against a governmental entity.  *Goodman v. Harris County*, 571 F.3d 388, 395 (5th Cir. 2009).

Individual-capacity suits seek to impose liability upon a government official as an individual, while

official-capacity suits "generally represent only another way of pleading an action against an entity

of which an officer is an agent." *Monell v. Dept. of Soc. Serv.'s of City of New York*, 436 U.S. 658, 690 n. 55 (1978).[2]

In an individual-capacity suit, "it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). However, in such a suit, the official may assert the defense of qualified immunity. *Id.* "The doctrine of qualified immunity shields government officials acting within their discretionary authority from liability when their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known." *Wallace v. County of Comal*, 400 F.3d 284, 289 (5th Cir. 2005). The Court will now address each of Plaintiffs' § 1983 claims.

### 1.      David and Helen Kincheloe's § 1983 claims against Chief Caudle

Plaintiffs David and Helen Kincheloe ("Kincheloes") allege that Chief Caudle's actions with regard to the shooting and killing of their pet dog violated their Fourth Amendment rights and deprived them of their property without due process of law in violation of the Fourteenth Amendment. Chief Caudle argues that he is entitled to qualified immunity with regard to Plaintiffs' Fourth and Fourteenth Amendment claims.

---

[2]Plaintiffs have brought their § 1983 claims against the Individual Defendants in their individual *and* official capacities. However, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity." *Goodman*, 571 F.3d at 395 (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). Thus, Plaintiffs's § 1983 claims against the Individual Defendants in their *official* capacities must be treated as claims against the City. *See Id.* Because the City is a named party in this case, no purpose is served by allowing Plaintiffs' duplicative § 1983 official capacity claims against the Individual Defendants to proceed. See *Dreyer v. City of Southlake*, 2007 WL 2458778 at * 10 (Aug. 22, 2007) (dismissing redundant official capacity § 1983 claims against individual defendants since city was also named as a party). Accordingly, the Court will RECOMMEND that the District Court GRANT Defendants' Motion to Dismiss Plaintiffs' § 1983 claims against Individual Defendants Caudle and JoAnn Stephens in their *official capacities.*

As noted, the doctrine of qualified immunity shields government officials acting within their discretionary authority from liability when their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known. The process of evaluating qualified immunity requires two steps: "[t]he first step is to determine whether plaintiff alleged a violation of a clearly established constitutional right" and "[t]he second step requires determining whether . . . the official's conduct was objectively reasonable under clearly established law existing at the time of the incident." *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 490 (5th Cir. 2001) (emphasis in original).

### a. Fourth Amendment Claim

The Kincheloes allege that Chief Caudle's shooting and killing of their dog violated their Fourth Amendment rights to be free from unreasonable searches and seizures and to be free from the inexcusable and arbitrary use of excessive force.

The Fourth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, provides that "[t]he right of the people to be secure in their persons, houses, papers, and *effects*, against unreasonable searches and seizures, shall not be violated. . . ." U.S. CONST. amend. IV. A "seizure" of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

Defendants argue that Kincheloes' Fourth Amendment claim against Chief Caudle is without merit because "a dog has no 4th Amendment rights," and "[a]s a matter of law , there can never be excessive force under the 4th Amendment applied to a dog." Defendants' MSJ at 12 and Defendants' Reply at 3. Defendants' arguments are entirely misplaced since the Kincheloes are not alleging a Fourth Amendment claim on behalf of *their dog* but rather, are alleging such a claim on behalf of

*themselves.* Defendants ignore the fact that "[e]very circuit that has considered the issue has held that the killing of a companion dog constitutes a 'seizure' within the meaning of the Fourth Amendment" and thus can constitute a cognizable claim under § 1983.[3] As explained by the Third Circuit in *Brown*, 269 F.3d at 209, dogs are considered the personal property of their owners and are thus protected by the Fourth Amendment. Accordingly, the killing of a pet dog (*i.e.*, the destruction of property) constitutes a Fourth Amendment seizure. *Id.* Because Plaintiffs have alleged a violation of a clearly established constitutional right, Chief Caudle's actions were only constitutional if it is determined that the killing of Buddy was objectively reasonable under the circumstances.

Courts must look to "the totality of the circumstances to determine whether the destruction of property was reasonably necessary to effectuate the performance of the law enforcement officer's duties." *San Jose Charter*, 404 F.3d at 975. "A seizure becomes unlawful when it is 'more intrusive than necessary.' " *Id.* (quoting *Florida v. Royer*, 460 U.S. 491, 504 (1983)). Courts must judge the reasonableness of an officer's conduct "objectively," that is, without reference to the subjective intent or motivation that underlies the officer's conduct. *Lytle v. Bexar County, Texas*, 560 F.3d 404, 411 ((5th Cir. 2009) (quoting *Graham v. Conner*, 490 U.S. 386, 397 (1989)). Courts must also look at the facts and circumstances "from the perspective of a reasonable officer on the scene, rather than

___

[3]*Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008). *See e.g.*, *Andrews v. City of West Branch*, 454 F.3d 914, 918 (8th Cir. 2006) (holding that police officer's shooting of pet dog can constitute a seizure under the Fourth Amendment); *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 975 (9th Cir.) (holding that an officer's killing of a dog constitutes a seizure under the Fourth Amendment), *cert. denied*, 546 U.S. 1061(2005); *Altman v. City of High Point, N.C.*, 330 F.3d 194, 204-05 (4th Cir. 2003) (holding that animal control officers' actions of killing owner's dogs constituted a "seizure" of the owner's "effects" under the Fourth Amendment); *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 210-11 (3d Cir. 2001) (same); *Maldonado v. Fontanes*,568 F.3d 263, 271 (1st Cir. [Puerto Rico] 2009) (holding that killing of pet cats and dogs constituted a seizure under the Fourth Amendment); *Siebert v. Severino*, 256 F.3d 648, 656 (7th Cir. 2001) (holding that the seizure of a horse is a Fourth Amendment event).

with the 20/20 vision of hindsight," and courts "must account for the difficult and often split-second decisions that police officers must make in carrying out their duties." *Id.* Moreover, the reasonableness of an officer's conduct under the Fourth Amendment is often a question that requires the input of a jury. "This is not only because the jury must resolve disputed fact issues but also because the use of juries in such cases strengthens our understanding of Fourth Amendment reasonableness." *Lytle*, 560 F.3d at 411. As the Fifth Circuit has explained:

> [R]easonableness under the Fourth Amendment should frequently remain a question for the jury. To put the matter more directly, since we lack a clearly defined rule for declaring when conduct is unreasonable in a specific context, we rely on the consensus required by a jury decision to help ensure that the ultimate legal judgment of "reasonableness" is itself reasonable and widely shared.

*Id.* (quoting *Abraham v. Raso*, 183 F.3d 279, 290 (3d Cir. 1999)).

Accordingly, to determine whether the shooting and killing of Buddy was reasonable, the Court must carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396. As many courts have recognized, the state undoubtedly has an interest in restraining a pet found at large in order to protect the safety of the public. *Brown*, 269 F.3d at 210. Thus, the "dog catcher" does not violate the Fourth Amendment when he takes a stray dog into custody. *Id.* Moreover, the state's interest in protecting the public may be implicated when there is reason to believe that a particular pet poses an imminent danger to the public. *Id.* Thus, the state's interest may even justify the killing of a pet if it poses an immediate danger to an individual. *Id.* "This does not mean, however, that the state may, consistent with the Fourth Amendment, destroy a pet when it poses no immediate danger and the owner is looking on, obviously desirous of retaining custody." *Id.* at 211.

12

Based upon Plaintiffs' allegations, which the Court must accept as true, it appears that Buddy did not pose an immediate danger to the public or Chief Caudle when Chief Caudle decided to draw his weapon and shoot and kill Buddy. According to his own admissions, on the morning of August 25, 2008, Chief Caudle was driving in his patrol car when he spotted Buddy walking down the Kincheloes' street. *See* Chief Caudle Aff., Exhibit A to Appendix to Defendants' MSJ at p. 2. Chief Caudle admits in his affidavit that he knew Buddy belonged to the Kincheloes, but was concerned that the dog was out loose "because the dog was a pit bull" and prior to this incident, he had heard that "a pit bull owned by the Kincheloes had been involved in an attack on a family member." *Id.* After yelling at the dog from his patrol car, Chief Caudle then followed Buddy back to the Kincheloes' residence, where he knew Buddy resided. *Id.* After watching Buddy walk onto the Kincheloes' property and stop near the front porch of the house, Chief Caudle parked his vehicle and got out of his car. Helen Kincheloe's granddaughter, Crystal Clark, then walked out on the front porch of the house and called for Buddy. *Id.* At this point, the parties' version of the facts differ dramatically. Chief Caudle claims that after Buddy ignored Crystal's calls, the dog charged Chief Caudle in an aggressive manner and that he was therefore forced to fire two shots at the dog for his "own protection." *Id.* at p. 3. In contrast, Plaintiffs contend that when Crystal walked onto the front porch she saw Buddy sitting next to the front porch and Chief Caudle standing in front of his patrol car in the street. Before Crystal was able to call out for Buddy a second time, she contends that Buddy began to walk slowly toward some bushes in the front yard. Clark Aff., Exhibit B to Plaintiffs' Response at p. 2. At this point, she alleges that Chief Caudle drew his gun and fired two shots at Buddy, killing him. Plaintiffs deny that Buddy charged Chief Caudle or acted aggressively in any manner. Based upon Plaintiffs' allegations, Chief Caudle was not faced with exigent

13

circumstances[4] that necessitated the killing of the dog. If the facts asserted by the Plaintiffs are found to be true, the Court finds that a reasonable officer in Chief Caudle's position would have known that the killing of the Kincheloes' dog at the Kincheloes' residence was unlawful.[5] Accordingly, the Court finds that material fact issues exist as to the reasonableness of Chief Caudle's shooting and killing of the Kincheloes' pet dog which precludes summary judgment on this issue.

### b. Fourteenth Amendment Due Process Claims

Plaintiffs' Complaint alleges that Chief Caudle's actions "deprived [the Kincheloes] of the taking of property." Complaint at ¶ 37. While the Complaint references the Fourteenth Amendment, it fails to state whether Plaintiffs are pursuing a procedural due process claim or a substantive due process claim under the Fourteenth Amendment, or if they are pursuing a "takings claim." While

---

[4]See e.g., *Altman*, 330 F.3d at 206 (finding that killing of dogs was reasonable where officer was charged by a pack of five dogs that had already attacked persons in the neighborhood and another officer)

[5]*See Vilo*, 547 F.3d at 711-12 (holding that fact issues precluded summary judgment on qualified immunity defense where plaintiffs alleged that officer shot their pet dog multiple times after the dog no longer posed a threat); *Andrews,* 454 F.3d at 918-19 (finding that officer was not entitled to qualified immunity where facts showed that police chief knew at the time he shot pet dog in enclosed yard that he was violating dog owner's clearly established Fourth Amendment rights); *Brown*, 269 F.3d at 209, 211-212 (finding that there were material fact issues which precluded summary judgment for officer on Fourth Amendment claim where plaintiffs alleged "officer intentionally and repeatedly shot a pet without any provocation and with knowledge that it belonged to the family who lived in the adjacent house and available to take custody."); *Fuller v. Vines*, 36 F.3d 65, 68 (9th Cir. 1994), overruled on other grounds, by *Robinson v. Solano County*, 278 F.3d 1007 (9th Cir. 2002) (finding that fact issues precluded summary judgment where plaintiffs alleged that police officers walked onto plaintiffs' front lawn and fired shots at dog after the dog had stood up and denied that dog had charged officer). See also, *San Jose Charter,* 405 F.3d at 978 (denying summary judgment on qualified immunity grounds after finding that "[a] reasonable officer should have known that to create a plan to enter the perimeter of a person's property, knowing all the while about the presence of dogs on the property, without considering a method for subduing the dogs besides killing them, would violate the Fourth Amendment.").

Plaintiffs' Response to Chief Caudle's Motion for Summary Judgment indicates that the Kincheloes are *not* pursuing a takings claim under the Fifth Amendment, Plaintiffs still fail to clarify whether they are pursuing a procedural or substantive due process claim. Instead, Plaintiffs simply allege that Chief Caudle's shooting and killing of Buddy "deprived Plaintiffs Helen and David Kincheloe of their personal property without due process of law" in violation of the Fourteenth Amendment. Plaintiffs' Response at 6. Out of an abundance of caution, the Court will therefore address both components of the Due Process Clause with regard to this claim.

(1).      Substantive Due Process

Where a constitutional amendment provides an explicit textual source of protection against certain government misconduct, that amendment is the guide for analysis of the claim rather than the generalized notion of substantive due process. *Albright v. Oliver*, 510 U.S. 266, 273 (1994); *Graham v. Connor*, 490 U.S. 386, 395 (1989). As discussed in detail above, a police officer's killing of a pet dog constitutes a destruction of property and therefore may constitute a seizure under the Fourth Amendment. Plaintiffs have failed to explain how their possible substantive due process claim is not already covered by their Fourth Amendment claim. Because the substantive component of the Due Process Clause does not provide Plaintiffs with any additional relief than that provided by their Fourth Amendment claim, any possible substantive due process claim should be dismissed. See *Folkers v. City of Waterloo*, 582 F. Supp.2d 1141, 1155 (N.D. Iowa 2008) (holding that Fourth Amendment rather than substantive due process provision of the Fourteenth Amendment was proper means for dog owner to bring claim against offer's seizure of his dog); *Dziekan v. Gaynor*, 376 F. Supp.2d 267, 270 (D. Conn. 2005) (where officer killed pet dog, substantive due process claim was not warranted since Fourth Amendment provided explicit protection against unreasonable seizure).

(2).    Procedural Due Process

In determining whether state action has violated an individual's right to procedural due process, a court must address two questions. "First, it must decide whether the state action has deprived the individual of a protected interest-life, liberty, or property.  If it finds such a deprivation, the court must determine whether the state procedures available for challenging the deprivation satisfy the requirements of due process."*Augustine v. Doe*, 740 F.2d 322, 327 (5th Cir. 1984).  In the instant case, Plaintiffs assert that Chief Caudle's shooting and killing of Buddy deprived the Kincheloes of their personal property without due process of law.  Chief Caudle's actions clearly deprived the Kincheloes of their property.  See *Id.* (removal of dog constituted a deprivation of property).  Thus, the Court must now determine whether the state procedures available to the Kincheloes were sufficient to satisfy the Due Process Clause.

Ordinarily, under the Due Process Clause, the state may not take property from an individual without providing pre-deprivation notice and a hearing.  *See Zinermon v. Burch*, 494 U.S. 113, 127 (1990).  However, "[u]nder the *Parratt/Hudson* doctrine, a state actor's random and unauthorized deprivation of a plaintiff's property does not result in a violation of procedural due process rights if the state provides an adequate post-deprivation remedy." *Alexander v. Ieyoub*, 62 F.3d 709, 712 (5th Cir. 1995).  See *Hudson v. Palmer*, 468 U.S. 517, 529-37 (1984); *Parratt v. Taylor*, 451 U.S. 527, 535-45 (1981), overruled on other grounds, *Daniels v. Williams*, 474 U.S. 327 (1986).  The doctrine rests on the premise that because the state is unable to predict random and unauthorized conduct, pre-deprivation remedies are infeasible.  *Zinermon*, 494 U.S. at 128-32.  In such a case, the provision of adequate state law post-deprivation remedies provides all the due process that is required. *Id.*  As the Fifth Circuit discussed in *Augustine*, 740 F.3d at 327, the "controlling question"

in determining the applicability of the *Parratt/Hudson* doctrine is "whether the State is in a position to provide for predeprivation process."

> *Parratt* posits a distinction between (1) the random and unauthorized (and hence unpredictable) conduct of a state actor, and (2) conduct that the state can contain and direct by instituting procedural safeguards. If the state cannot protect the individual by imposing predeprivation procedures, or if quick action is essential, the best the state can do is to allow injured individuals to recover damages after the injury has occurred. If, however, the state is able to provide the affected individual with a hearing before the deprivation occurs, due process usually requires that the state do so. The availability of a postdeprivation tort remedy does not satisfy the requirements of due process in such cases.

*Id.* at 327-28 (internal citations omitted).

In the instant case, the Kincheloes allege that Chief Caudle violated their due process rights by shooting and killing their pet dog. Plaintiffs do not allege that Chief Caudle's actions were "random and unauthorized." Rather, Plaintiffs contend that Chief Caudle's actions were taken "as a matter of custom and policy" and that the City of Bertram was aware of Chief Caudle's reckless behavior but that it chose to ignore his actions. Plaintiffs' Complaint at ¶ 38. "As [the Fifth Circuit] has noted, where employees are acting in accord with customary procedures, the 'random and unauthorized' element required for the application of the *Parratt/Hudson* doctrine is simply not met." *Brooks v. George County, Miss.*, 84 F.3d 157, 165 (5th Cir. 1996) (internal citations omitted). Accordingly, Plaintiffs' allegations – which the Court must accept as true—preclude the application of the *Parratt/Hudson* doctrine to Plaintiffs' procedural due process claim at this stage of the proceedings. See *Augustine*, 740 F.2d at 328-29 (finding that allegations precluded application of *Parratt/Hudson* and noting that further proceedings may show either that the acts were "random and unauthorized" thus showing no liability or that they may have represented "official policy" and the availability of postdeprivation remedies would not bar plaintiffs' procedural due process claim).

Accordingly, Defendants' Motion for Summary Judgement with regard to the Plaintiffs' procedural due process claim must be denied.

### 2. William Bell's § 1983 claims against Chief Caudle

#### a. Excessive Force claim

Plaintiffs allege that Chief Caudle's actions in kicking open Bell's door and charging into his home "while reaching for his gun" constituted excessive force under the Fourth Amendment. Defendants argue that Bell's excessive force claim fails because he has failed to show that he suffered any "injury" at the hands of Chief Caudle.

To prevail on an excessive force claim, a plaintiff must show: (1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable. *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005). Thus, Defendants are correct that a plaintiff alleging an excessive force violation must show that he has suffered "at least some injury." *Flores v. City of Palacios*, 381 F.3d 391, 397 (5th Cir. 2004). Although the Fifth Circuit no longer requires "significant injury" for excessive force claims, the plaintiff's injury must be more than *de minimis*. *See Tarver*, 410 F.3d at 752. "[C]ertain injuries are so slight that they will never satisfy the injury requirement." *Flores*, 381 F.3d at 397-98. For example, "handcuffing too tightly, without more, does not amount to excessive force." *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001).

In the instant case, Plaintiffs do not contend that Bell suffered any physical injuries at the hands of Chief Caudle but, rather contend that Bell suffered "emotion[al] and mental distress." Plaintiffs' Response at p. 6. While the Fifth Circuit has held that purely psychological injuries may sustain a Fourth Amendment claim, *Flores*, 381 F.3d at 397-98, "only substantial psychological

injuries are sufficient to satisfy the injury element of a § 1983 claim for excessive force under the Fourth Amendment." *Martin v. City of Alexandria Municipality Police Dept.*, 2005 WL 4909292 (W.D. La. Sep. 16, 2005). In the instant case, Plaintiffs have failed to proffer any evidence whatsoever to show that Bell suffered any substantial psychological injuries from the incident with Chief Caudle that are greater than *de minimis*. Accordingly, Bell's excessive force claim must be dismissed.

### b.      Unlawful search and seizure claim

Plaintiffs also allege that Chief Caudle's warrantless entry into Bell's home violated Bell's Fourth Amendment rights to be free from unreasonable searches and seizures.

"The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal citations and quotations omitted). Accordingly, "[w]arrantless searches of a person's home are presumptively unreasonable unless the person consents, or unless probable cause and exigent circumstances justify the search." *United States v. Gomez-Moreno*, 479 F.3d 350, 354 (5th Cir. 2007). Chief Caudle argues that his warrantless entry into Bell's house was permitted because Bell consented to the entry and exigent circumstances existed.

### 1.      Consent

Chief Caudle first argues that his entry into Bell's home was constitutional because Bell consented to his entry into the house. Defendants point out that Bell initially called 911 "which significantly impacts any expectation of privacy that Bell may reasonably assert." Chief Caudle's Motion for Summary Judgment at p. 16. In addition, Chief Caudle alleges in his affidavit that when he approached Bell's front door, "Mr. Bell turned to the side to let me enter." Chief Caudle Aff. at

¶ 12, Ex. A to Defendants' Appendix in Support of MSJ. Thus, Chief Caudle argues that Bell consented to his warrantless entry into his house. Bell disputes that he consented to entry and instead alleges that after he went into his house (to get J.F. in order to turn him over to Chief Caudle as requested), Chief Caudle kicked in his front door, charged into his home and reached for his gun. Bell Aff. at ¶ 8. Even if the Court viewed the incident according to Chief Caudle's viewpoint, it would not establish that Bell consented to the entry. The Fifth Circuit has held that "[s]ilence or passivity cannot form the basis for consent to enter." *Gates v. Texas Dept. of Protective and Regulatory Services*, 537 F.3d 404, 420 (5th Cir. 2008). "It is well established that a defendant's mere acquiescence to a show of lawful authority is insufficient to establish voluntary consent." *United States v. Jaras*, 86 F.3d 383, 389 (5th Cir. 1996) (holding that suspect's silence and failure to object to officer's search did not imply that he consented to the search). *See also*, *United States v. Shaibu*, 920 F.2d 1423 (9th Cir. 1990) (holding that defendant had not impliedly consented to a search of his home by his failure to object when police followed him inside). Moreover, the 911 call placed by Bell was complaining of an agitated woman yelling in his front yard. It is undisputed that when Caudle arrived at Bell's house, he found J.F.'s mother in the front yard, and spoke to her for several minutes before approaching Bell. In these circumstances, no reasonable person would construe Bell's 911 call as providing consent to enter his home. Because there is no evidence in the record that Bell affirmatively consented to Chief Caudle entering his home, Chief Caudle cannot rely on the consent exception to the Fourth Amendment's warrant requirement.

## 2. Exigent circumstances

The Supreme Court has held that "[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from

imminent injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). The Fifth Circuit has concluded that immediate safety risks to police officers and others are exigent circumstances that may excuse a warrantless entry into a residence. *United States v. Jones*, 239 F.3d 716, 720 (5th Cir.), *cert. denied*, 534 U.S. 861 (2001). The Government bears the burden of demonstrating exigent circumstances. *Gomez-Moreno*, 479 F.3d at 354. "Because it is essentially a factual determination, there is no set formula for determining when exigent circumstances may justify a warrantless entry." *Jones*, 239 F.3d at 720 (internal quotation marks omitted). However, the court must view the circumstances objectively and set aside any of the officer's subjective motivations. *See Brigham City*, 547 U.S. at 404. "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.'" *Id.* (quoting *Scott v. United States,* 436 U.S. 128, 138 (1978)) (emphasis in original). Thus, the Court must consider whether the evidence relied upon by Defendants would objectively indicate to a reasonable police officer that J.F. was in imminent danger such that a warrantless entry into Bell's house was permitted by the Fourth Amendment.

Chief Caudle argues that exigent circumstances existed to enter Bell's home because he was concerned for the welfare of the minor, J.F., who was at the time, asleep inside Bell's house. Chief Caudle alleges that he was concerned "for the child's welfare" because Bell was "agitated," was wearing "torn and soiled clothing" and had a "messy" house. Chief Caudle Aff. at 11. Clearly, this evidence alone does not suggest that J.F. was in "imminent" danger. Chief Caudle has failed to point to any evidence in the record that would suggest in any way that Bell was violent or had a history of domestic violence or that J.F. was in any danger whatsoever. *See Gates*, 537 F.3d at 422-23 (holding that exigent circumstances did not exist to justify warrantless entry into plaintiff's house

where there was no allegations that suspect had abused any of his children and no emergency situation was present). In fact, Bell alleges—and Defendants do not contradict—that he was on his way to wake up J.F. and turn him over to Chief Caudle when Chief Caudle suddenly kicked open his front door. The Court finds that a reasonable police officer would not have believed that J.F. was in imminent danger under such circumstances and thus Chief Caudle has failed to demonstrate that exigent circumstances existed in this case. *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1241 (10th Cir. 2003) ("Because no evidence indicates that [child] was in immediate threat of death or severe physical harm-indeed, the evidence points to the opposite conclusion-we do not find sufficient exigent circumstances to relieve the state actors here of the burden of obtaining a warrant"). Accordingly, the Court finds that Bell has alleged a violation of a clearly established constitutional right. The Court also finds that this right was clearly established at the time of the incident and therefore Chief Caudle is not entitled to qualified immunity with regard to Bell's Fourth Amendment illegal search and seizure claim.

### 3. Plaintiffs' First Amendment Claims

Plaintiffs Helen and David Kincheloe, Willaim Bell, David Thomas, Melinda Copeland, and Kristen Bergeson allege that the Mayor of Bertram, JoAnn Stephens, violated their First Amendment rights by preventing them from speaking at a City Council meeting. Specifically, Plaintiffs allege that in the summer of 2008, Melinda Copeland met with Mayor Stephens and requested that a petition calling for the firing of Chief Caudle (which was signed by 48 residents of Bertram, including the Plaintiffs) be placed on the City Council's agenda. Plaintiffs allege that Mayor Stephens demanded a copy of the Petition, but that Copeland refused to give it to the Mayor for fear of "retaliation against those who signed it." Ms. Copeland alleges that the Mayor then told her that

the Petition was "illegal" because it did not contain the phone numbers and voter registration information of all the petitioners.  Copeland Aff. at ¶ 3, Exhibit B to Plaintiff's Response.  Ms. Copeland contends that this was the first time that she ever heard of this requirement.  Ms. Copeland further alleges that at the Bertram City Council meeting on June 10, 2008, Mayor Stephens refused to place the Petition on the agenda and told her that her Petition "would never be placed on the agenda of a City Council meeting." Copeland Aff. at ¶ 7.  Plaintiffs claim that Mayor Stephens' refusal to place the Petition on the City Council agenda violated their First Amendment rights.  Plaintiffs contend that the City created a public forum by opening up the City Council meetings to public participation and thus could not deny certain individuals the right to speak based upon the content of their speech.

Defendants first argue that Plaintiffs have failed to show a violation of their First Amendment rights because "the evidence establishes that Mayor Stephens did not refuse to allow Plaintiffs to ever present any petition at a  City Council meeting." Defendant Stephens' MSJ at p.13.  The Court disagrees.  Plaintiffs' Complaint clearly alleges that Mayor Stephens placed a prior restraint on Ms. Copeland's speech by informing her that the petition would never be placed on the Council's agenda and by preventing her from speaking at the City Council meeting.  Accordingly, Plaintiffs have alleged sufficient facts to raise a fact issue with regard to their First Amendment claim.

The First Amendment to the United States Constitution provides, in relevant part, that "Congress shall make no law . . . abridging the freedom of speech, or of the press, or of the right of the people peaceably to assemble. . . " U.S. CONST. amend I.  Although the First Amendment prohibits the government from abridging freedom of speech, it does not prohibit all regulation of expressive activities.  For example, the government may enforce regulations of "the time, place, and manner

of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). The constitutionality of a regulation on free speech is dependent in large part on *where* that speech is being exercised. See *Perry*, 460 U.S. at 44 ("[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue"). The Supreme Court has identified four types of forums in the context of First Amendment activity occurring on government-owned property: (1) the traditional public forum, (2) the public forum created by governmental designation, (3) the limited public forum, and (4) the nonpublic forum. *Cornelius v. NAACP Legal Def. & Edu. Fund, Inc.*, 473 U.S. 788, 802 (1985).

In order for the state to enforce a content-based limitation on speech in a *public forum,* such as a street or a park, it must withstand strict scrutiny by showing that "its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry*, 460 U.S. at 45. The state may also regulate "the time, place, and manner of expression" occurring in a public forum if the regulations "are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id*. In addition to traditional public forums, "a public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius*,  473 U.S. at 802 (reasoning that a designated public forum exists when the government "intentionally open[s] a nontraditional public forum for public discourse"). The state's power to control a speaker's access to these "designated public

forums" is "subject to the same first amendment constraints that apply to traditional public forums." *Estiverne v. Louisiana State Bar Ass'n.*, 863 F.2d 371, 376 (5ᵗʰ Cir. 1989).

In contrast to designated public forums, "limited public forums" describe forums opened for public expression of a limited type—for example by the topic of discussion, the manner of communication, or the class of individuals permitted to speak. *Chiu v. Plano Independent School Dist.*, 260 F.3d 330, 346 (5ᵗʰ Cir. 2001). When the government establishes a limited public forum of this sort, the government is not required to, and often does not, allow persons to engage in every type of speech. *Good News Club v. Milford Central School*, 533 U.S. 98, 106 (2001). The government may be justified "in reserving [its forum] for certain groups or for the discussion of certain topics." *Id.* (quoting *Rosenberger v. Rector and Visitors of Univ. of Virginia.*, 515 U.S. 819, 829 (1995)). When a public body establishes a limited public forum of this sort, that body may restrict the expression that takes place within the forum so long as the restriction (1) does "not discriminate against speech on the basis of viewpoint" and (2) is "reasonable in light of the purpose served by the forum." *Chiu*, 260 F.3d at 346. Finally, there is the "nonpublic forum," which describes public property that is not by tradition or designation open for public communication. As with limited public forums, the government can restrict access to a nonpublic forum as long as the restrictions are reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677-78 (1998).

The speech at issue in this case falls into the second category described above—the public forum created by governmental designation. Plaintiffs allege that Mayor Stephens prevented them from speaking at the public comment session of the City Council meeting based on the content of

their speech. "When a government entity allows a public question and answer period or a period of public participation, it creates a public forum." *Luckett v. City of Grand Prairie*, 2001 WL 285280 at * 5 (N.D. Tex. March 19, 2001). Because Plaintiffs have alleged that Defendant Stephens prevented the petition from being heard and prevented Ms. Copeland from speaking because of their viewpoint with regard to Chief Caudle, Plaintiffs have alleged a violation of the First Amendment. The "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. . . . Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone." *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 96 (1972).

Even if the Court concluded that the City Council meeting in this case was a nonpublic forum, it would nevertheless find that Plaintiffs have alleged a violation of their clearly established First Amendment rights. A nonpublic forum status "does not mean that the government can restrict speech in whatever way it likes." *International Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 687 (1992). "To be consistent with the First Amendment, the exclusion of a speaker from a nonpublic forum must not be based on the speaker's viewpoint and must otherwise be reasonable in light of the purpose of the property." *Arkansas Educ. Television Com'n.*, 523 U.S. at 682. See also, *Rowe v. City of Cocoa, Fla.*, 358 F.3d 800, 802-03 (11th Cir. 2004) (finding that routine city council meetings are considered limited public forums which permit content-neutral reasonable time, place and manner restrictions). Plaintiffs have alleged that their speech was thwarted because of their viewpoint with regard to Chief Caudle.

In defense of the allegation that she violated Plaintiffs' First Amendment rights in this case, Mayor Stephens relies on § 551.074 of the Texas Government Code to argue that the City Council

was not required to hold an "open meeting" to hear complaints against Police Chief Caudle. Section 551.074 of the Texas Government Code provides that a governmental body is not required to conduct an open meeting "(1) to deliberate the appointment, employment, evaluation, reassignment, duties, discipline, or dismissal of a public officer or employee; or (2) to hear a complaint or charge against an officer or employee." TEX. GOV'T CODE § 551.074. While Defendants are correct that ordinary personnel matters are excluded from the open meeting requirements, "the termination of a city's police chief is a matter of special interest to the public that does not fall into the category of ordinary personnel matters." *Mayes v. City of De Leon*, 922 S.W.2d 200, 203 (Tex. App.–Eastland1996, writ denied). As the Texas Court of Appeals has stated, "[t]he public has a special interest in matters relating to the employment of its police chief because of the duties related to the office of chief of police, of the importance of those duties to the citizens, and of the broad contact with the public that those duties involve regardless of the size of the City's workforce or the size of the police department budget." *Id.* Accordingly, § 551.074 of the Texas Government Code does not trump the First Amendment in this case.

Based upon the foregoing, the Court finds that Plaintiffs have alleged sufficient facts to raise a fact issue with regard to whether Mayor Stephens violated Plaintiffs' First Amendment rights. The Court also finds that Plaintiffs' right to petition their government was "clearly established" and that a reasonable government official in Stephens' position would have understood that her actions were unconstitutional, and that Mayor Stephens is therefore not entitled to qualified immunity with regard to this claim. Because "the Texas Constitution grants broader protection to speech than does the United States Constitution," the Court similarly finds that Mayor Stephens is not entitled to official

immunity with regard to Plaintiffs' free speech claims under the Texas Constitution. *Finch v. Fort Bend Independent School Dist*, 333 F.3d 555, 563 n.4 (5th Cir. 2003).

### 4.     Plaintiff Pogue's First Amendment claim

Plaintiff L.O. Pogue, Mayor Pro Tem of Bertram, alleges that Mayor Stephens violated his First Amendment free speech rights by her "repeated obstruction of his speech when airing concerns about city governance, finances, and Chief Caudle's tenure as Chief of Police." Plaintiffs' Response to Defendants' Judgment on the Pleadings at p. 2.  Specifically, Pogue alleges that after he read a letter to the Bertram City Council meeting on June 10, 2008—which described Chief Caudle's alleged threats against Pogue after Pogue had informed him that he would no longer support Chief Caudle as Police Chief—Mayor Stephens refused to put the letter in Chief Caudle's personnel file as he requested.  Although Pogue was permitted to read the letter aloud to the City Council at the meeting, he complains that the Mayor failed to place the letter in Chief Caudle's personnel file. Pogue also alleges that he has repeatedly spoken out about "fraud in the City's financial dealings, and questioned the accountability of Bertram city fund investments, conflicts of interest, and proper reporting of funds spent." Plaintiffs' Complaint at ¶ 32.  Pogue further claims that Mayor Stephens has refused to permit him to speak to the City Attorney about these matters without her or the City Council's permission.  Pogue claims that as a result of his outspokenness about the above-matters, "the Police Chief and Mayor have both pushed for Mr. Pogue's resignation in retaliation." Plaintiffs' Complaint at ¶ 34.

The Supreme Court "has made clear that public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public

concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). However, while the First Amendment invests public employees with certain rights, it does not empower them to "constitutionalize the employee grievance." *Connick v. Myers*, 461 U.S. 138, 154 (1983). A public employee suing his employer must establish four elements in support of his First Amendment retaliation claim: (1) the employee must suffer an adverse employment decision; (2) the employee's speech must involve a matter of public concern; (3) the employee's interest in commenting on matters of public concern must outweigh the defendant's interest in promoting efficiency; and (4) the employee's speech must have motivated the employer's adverse action. *Oscar Renda Contracting, Inc. v. City of Lubbock*, 463 F.3d 378, 382 (5th Cir. 2006), *cert. denied*, 549 U.S. 1339 (2007).

The Court finds that Pogue has failed to demonstrate the first element of his First Amendment retaliation claim since he has not suffered an adverse employment action. Adverse employment actions are "discharges, demotions, refusals to hire, refusals to promote, and reprimands." *Breaux v. City of Garland*, 205 F.3d 150, 157 (5th Cir.), *cert. denied,* 531 U.S. 816 (2000). The Fifth Circuit has pointedly "declined to expand the list of actionable actions," noting that "some things are not actionable even though they have the effect of chilling the exercise of free speech." *Id.* Among the type of actions held by the Fifth Circuit *not* to be adverse employment actions are mere accusations or criticism (even oral threats or abusive remarks), investigations, psychological testing, false accusations, and polygraph examinations that do not have adverse results for the plaintiff. *Id.* at 157-58. The only retaliation which Pogue points to is that Mayor Stephens "pushed for" his resignation. However, Pogue fails to point to any facts in support of this allegation. Verbal threats of termination and criticism have been held not to rise to the level of an adverse employment action. *See Id.* at 159-60 (threats of termination alone do not constitute an adverse

29

employment action); *Chandler v. La Quinta Inns, Inc.*, 2008 WL 280880 at * 3 (5th Cir. Feb. 1, 2008) (threat of termination did not amount to constructive discharge or adverse action). "Some benefit must be denied or some negative consequence must impinge on the Plaintiff's employment before a threat of discharge is actionable." *Id.* at 159. Finally, the Court notes that Pogue is still employed with the City and thus cannot claim that he was constructively discharged. See *Id.* at 161 ("Since [Plaintiffs] still have their jobs with the Department and have neither been demoted nor transferred to less desirable positions, they have failed to show that the Defendants' actions amounted to a constructive or actual adverse employment action"); *Smith v. Univ. of Tex. Health Sci. Ctr. at Houston*, 100 Fed. App'x 980, 985 (5th Cir. 2004) (rejecting plaintiff's claim for constructive discharge because she was still employed at the company). Since Pogue has failed to allege an essential element of his First Amendment retaliation claim, his claim must be dismissed.

### 5.    Plaintiff Pogue's "Right to Counsel" claim

Plaintiff Pogue further alleges that Mayor Stephens told the City Attorney to not meet with him, thereby violating his constitutional right "to seek legal counsel's advice." Complaint at ¶ 61. Although Pogue fails to cite to a particular constitutional right which would support this claim, the Court assumes he is referring to the Sixth Amendment. However, the Sixth Amendment applies only to criminal prosecutions. See U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right. . .to have the assistance of counsel for his defense."); *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) (no right to counsel except in criminal prosecution and appeal). Further, nothing in the allegations suggests that Pogue was denied the ability to consult with counsel generally, but rather that he was impeded in his desire to speak to the City Attorney about official city business (problems with the Chief of Police). This is a far cry from denying Pogue the right to

consult with an attorney. Thus, Pogue has failed to allege sufficient facts to support his "right to counsel" claim.

**B.    Section 1983 Claims against the City of Bertram**

In addition to their constitutional claims against the Individual Defendants in this case, the Plaintiffs also make several constitutional claims against the City of Bertram. These claims include a Fourth Amendment excessive force claim, a Fourth Amendment unreasonable search and seizure claim, and a First Amendment freedom of speech claim.[6]

"[A] municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997). Rather, "a plaintiff seeking to impose liability on a municipality under § 1983 [is required] to identify a municipal policy or custom that caused the plaintiff's injury." *Id.* (citing *Monell v. New York City Dep't. of Soc. Servs.*, 436 U.S. 658, 694 (1978) (internal quotation marks omitted)). "The plaintiff must . . .demonstrate that . . .the municipality was the moving force behind the injury alleged," which requires him to prove a "direct causal link between the municipal action and the deprivation of federal rights." *Id.* at 404 (internal quotation marks omitted). To prove this causal link, a plaintiff may demonstrate either an express policy or a "persistent, widespread practice of city officials or employees, which,

_____

[6]Because the Court has already determined that the Individual Defendants cannot be held liable for Plaintiff Bell's claim of excessive force under the Fourth Amendment, or Plaintiff Pogue's claims under the First and Sixth Amendments, the City cannot be held liable under Section 1983 for such claims. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."); *Rios v. City of Del Rio*, 444 F.3d 417, 425-6 (5th Cir.) (finding that there could not be liability for the city where there was no underlying constitutional violation), *cert. denied*, 549 U.S. 825 (2006). Accordingly, Plaintiff Bell's excessive force claim and Plaintiff Pogue's First and Sixth Amendment claims against the City must be dismissed.

although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984), *cert. denied*, 472 U.S. 1016 (1985). A § 1983 plaintiff can also establish a municipal policy or custom by showing that the municipality failed to adequately train and supervise its officers. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Finally, a plaintiff can show a policy or practice by establishing that an official who is a final policymaker personally committed the violation of the plaintiff's constitutional rights.[7]

In the instant case, Plaintiffs allege that Chief of Police David Caudle committed the Fourth Amendment constitutional violations. Courts have consistently found that chiefs of police are official law enforcement policymakers for the purposes of municipal liability under § 1983. See *Fraire v. City of Arlington,* 957 F.2d 1268, 1279 n.45 (5th Cir.) (finding that the chief of police is the principal policy maker for the Arlington Police Department), *cert. denied*, 506 U.S. 973 (1992); *Zarnow v. City of Wichita Falls,* 2009 WL 481884 at * 5 (N.D. Tex. Feb. 25, 2009) (finding that chief of police was potential final policy maker for City of Wichita Falls for the purposes of § 1983 liability);

---

[7]*See Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) ("it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances"); *Bolton v. City of Dallas*, 541 F.3d 545, 548 (5th Cir. 2008 ) ("It is well-established that a single unconstitutional action by a municipal actor may give rise to municipal liability if that actor is a final policymaker.")*, cert. denied,* 129 S.Ct. 1669 (2009); *Turner v. Upton County, Tex.*, 915 F.2d 133, 136 (5th Cir. 1990) (sheriff's alleged participation as co-conspirator in plan to subject plaintiff to sham trial in violation of her due process rights would, if proven, lead to municipal liability under § 1983), *cert. denied*, 498 U.S. 1069 (1991); *Perry v. Metropolitan Suburban Bus Authority*, 390 F. Supp.2d 251, (E.D.N.Y. 2005) (noting that § 1983 plaintiff can show a municipal custom or policy by showing  that final policymaker directly committed or commanded the constitutional violation); *Howard v. Town of Jonesville,* 935 F. Supp. 855, 860 (W.D. La. 1996) (noting that government body may be held liable under § 1983 if final policymakers themselves commit unconstitutional actions). In comparison to *Williams v. City of Amory,* 2006 WL 1984596 at * 4 (N.D. Miss. July 12, 2006) (finding no municipal liability where plaintiff failed to allege that chief of police as final policy maker committed the constitutional violation).

*Williams v. City of Amory,* 2006 WL 1984596 at * 4 (N.D. Miss. July 12, 2006) (finding that police chief was chief official law enforcement policymaker for City of Amory, Mississippi); *Redd v. City of Odessa*, 2001 WL 681588 at * 11 (W.D. Tex. 2001) (concluding that chief of police is final policy maker for the Odessa Police Department). Accordingly, the Kincheloe and Bell Plaintiffs have alleged sufficient facts to withstand summary judgment on their Fourth Amendment claims against the City of Bertram.

Plaintiffs have also alleged that the Mayor violated the Plaintiffs' First Amendment rights. Because Mayor Stephens can be considered the ultimate policymaker of the City of Bertram in this case, the Court also finds that Plaintiffs have alleged sufficient facts to support their First Amendment claims against the City. See *Howard v. Town of Jonesville,* 935 F. Supp. 855, 860 (W.D. La. 1996) (holding that plaintiff had alleged sufficient facts to withstand summary judgment on municipal liability issue where plaintiff had alleged that the city's ultimate policymaker – the mayor – personally engaged in acts of discrimination). Accordingly, the Court will recommend that the District Court deny Defendants' Motion for Judgment on the Pleadings with regard to the above-claims.

## C.    Plaintiffs' State Law Claims

In addition to Plaintiffs' federal constitutional claims under 42 U.S.C. §1983, Plaintiffs are also pursuing several Texas State law claims. Defendants seek the dismissal of these claims as well.

### 1.    Plaintiffs' IIED claims against Chief Caudle

Plaintiffs Helen and David Kincheloe and William Bell have each brought an intentional infliction of emotional distress ("IIED") claim against Chief Caudle under Texas law. Specifically, the Kincheloes allege that Chief Caudle's "gratuitous killing of their dog, Buddy, was shocking and

outrageous," and "foreseeable that members of the Kincheloe family would suffer severe emotional harm from witnessing Chief Caudle killing on their property." Plaintiffs' Complaint at ¶ 39.

Chief Caudle first argues that he is immune from Plaintiffs' IIED claims pursuant to §101.106(e) of the Texas Civil Practice and Remedies Code. Section 101.106(e) states: "If a suit is filed under this chapter against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit." TEXAS CIV. PRAC. & REM.CODE § 101.106(e). The statute "was to force a plaintiff to decide at the outset whether an employee acted independently . . . thereby reducing the resources that the government and its employees must use in defending redundant litigation and alternative theories of recovery." *Mission Consolidated Independent School District v. Garcia*, 253 S.W.3d 653, 657 (Tex. 2008) (holding that all torts, including intentional torts, are subject to the Texas Tort Claims Act's election-of-remedies provision). The problem with Chief Caudle's reliance on § 101.106(e) is that Plaintiffs have not asserted their IIED claim against both the City of Bertram and Chief Caudle. While the allegations of Plaintiffs' Complaint are not as clear as might be desired, the Court has concluded that the only reasonable reading of the Complaint is that Plaintiffs have only asserted their IIED claims against Chief Caudle.[8] Because Plaintiffs have not brought their IIED claim against

---

[8]See e.g., Plaintiffs' Complaint at ¶40 ("These actions give rise to a claim for. . .damages for intentional infliction of emotional harm against Chief Caudle for Helen Kincheloe and David Kincheloe."); ¶ 64 ("Plaintiffs Helen Kincheloe and David Kincheloe seek actual damages against Chief Caudle for the death of their dog, punitive damages, as well as damages for emotional distress."); ¶ 44 ("Chief Caudle's dangerous act of threatening Bell, was shocking and outrageous, and was undertaken with the intent to cause serious emotional harm, and did cause same"); ¶ 65 ("Plaintiff William Bell seeks . . . damages against Chief Caudle for wrongfully entering onto his property, assault, and emotional distress"). See also, Plaintiffs' Response to Defendants' Motion for Judgment on the Pleadings at p.7 (clarifying that Plaintiffs have not brought an IIED claim against the City).

both the City and Chief Caudle, § 101.106(e) does not bar their claim. See *Garcia v. City of Harlingen*, 2009 WL 159583 at * 12 (S.D. Tex. Jan. 21, 2009) (finding that § 101.106(e) did not apply where plaintiff only asserted claims against the individual defendant).

Although Plaintiffs' IIED claims are not precluded under the Texas Civil Practice and Remedies Code, they nevertheless must be dismissed from this lawsuit. The Texas Supreme Court has stated that an IIED claim is available only "in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." *Hoffmann-La Roche, Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004). "The tort's clear purpose . . .was to supplement existing forms of recovery by providing a cause of action for egregious conduct that might otherwise go unremedied." *Id*. As such, "where the gravamen of a plaintiff's complaint is actually another tort, such as a constitutional civil rights violation or false imprisonment, a cause of action for intentional infliction of emotional distress is not available." *Burkett v. City of El Paso*, 513 F. Supp.2d 800, 825 (W.D.Tex. 2007) (quoting *Hoffmann-La Roche,* 144 S.W.3d at 447-48). Because Plaintiffs' IIED claims against Chief Caudle are based on the same operative facts as their Fourth Amendment constitutional claims, Plaintiffs cannot also pursue their IIED claims in this lawsuit. *See Id.* (dismissing plaintiff's IIED claim where based on the same facts as his constitutional claims); *Argo v. Brazoria County,* 2008 WL 2074075 at * 7 (S.D. Tex. May 14, 2008) (dismissing plaintiff's IIED claim since he was also pursuing constitutional claims based on the same facts). Accordingly, Plaintiffs' IIED claims against Chief Caudle must be dismissed.

### 2.    Plaintiff Bell's assault claim against Chief Caudle

Plaintiffs allege that Chief Caudle's altercation with Plaintiff William Bell on the night of August 17, 2008, constitutes assault under Texas law.  Specifically, Bell's Affidavit alleges that after Chief Caudle was dispatched to his home, he told Bell that if he did not hand over the minor to his mother, that he would send Bell to jail for kidnaping. Bell Affidavit at ¶ 6.  After arguing with Chief Caudle over whether to turn the child over to the allegedly intoxicated mother, Bell alleges that he finally went into his house to retrieve the minor.  At this point, Bell alleges that Chief Caudle "kicked the door in and came charging into my home.  I could see that he was reaching for his gun and he was yelling that I was not obeying his orders." Bell Affidavit at ¶ 8.  Bell further alleges that Chief Caudle shouted that Bell was interfering with a police matter and further threatened to "get CPS to take my son away."  Bell Affidavit at ¶ 9.  Bell also alleges that Chief Caudle ripped the telephone out of his hands and threw it on the ground.

Defendants argue that Bell has failed to meet the essential elements of an assault claim because Plaintiffs have failed to allege that Chief Caudle caused any bodily injury to Bell or that he threatened Bell with physical harm.  The Court agrees.

The elements of assault are the same in both civil and criminal cases.  *Morgan v. City of Alvin*, 175 S.W.3d 408, 418 (Tex. App.– Houston [1st Dist.] 2004, no pet.).  Under Texas Penal Code § 22.01(a), a person commits assault if the person (1) intentionally, knowingly, or recklessly causes bodily injury to another, (2) intentionally or knowingly threatens another with imminent bodily injury, or (3) intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative. Tex. Penal Code § 22.01(a)(1)-(3) (Vernon 2007).  Thus, an assault under §22.01(a)(1), requires that the

actor "caus[e] bodily injury" to another. *Juneau v. State*, 49 S.W.3d 387, 391 (Tex. App.– Fort Worth 2000, pet. ref'd). "Bodily injury" is defined as "physical pain, illness, or any impairment of physical condition." *Id.* at 390-91 (citing Tex. Penal Code § 1.07(a)(8)). Plaintiffs have failed to allege that Bell suffered any bodily injury at the hands of Chief Caudle and thus have failed to meet subsection (1) of the statute.

The Court also finds that Plaintiffs have failed to submit sufficient evidence to demonstrate that Bell was threatened with "imminent bodily injury" under subsection (2) of the statute. A threatened injury is "imminent" if it is "near at hand" or "on the verge of happening." *Devine v. State*, 786 S.W.2d 268, 270 (Tex. Crim. App. 1989); *Hill v. State*, 844 S.W.2d 937, 938 (Tex. App.– Eastland 1992, no pet.). In the present case, there is nothing in the record to show that Bell was threatened with imminent bodily injury within the meaning of the statute. Although Bell's affidavit alleges that Chief Caudle was "reaching for his gun" and yelling when he went into Bell's house, he does not allege that Chief Caudle ever pointed the gun at him[9] or threatened to use it in any manner. See Affidavit at ¶ 8. Because Plaintiffs have failed to present sufficient evidence in support of Bell's state assault claim, Defendants' Motion for Summary Judgment should be granted with respect to this claim.

---

[9]Even if Bell had so alleged, courts have held that a peace officer who points a gun at someone as a conditional threat to use actual force if necessary is privileged from tort liability under Texas law. See *Hinojosa v. City of Terrell*, 834 F.2d 1223,1231-32 (5th Cir. 1988) (holding that officer was privileged and did not commit assault under Texas law by pointing his pistol at the plaintiff); *Garza v. United States*, 881 F. Supp. 1103, 1106-07 (S.D. Tex. 1995) (holding that officers were privileged from tort of assault in drawing and pointing their weapons).

## IV. RECOMMENDATION

Based upon the foregoing, the undersigned **RECOMMENDS** that Defendants' Motion for Judgment on the Pleadings (# 10), David Caudle's Motion for Summary Judgment (# 19), and JoAnn Stephens' Motion for Summary Judgment (# 20) be **GRANTED IN PART** and **DENIED IN PART**.

The Court **RECOMMENDS** that the District Court **GRANT** the Motions with regard to the following claims: Helen Kincheloe and David Kincheloe's substantive due process claim and Texas intentional infliction of emotional distress claim; William Bell's Fourth Amendment excessive force claim and Texas intentional infliction of emotional distress and assault claims; Plaintiffs § 1983 claims against Defendant Caudle in his official capacity; and L.O. Pogue's First Amendment retaliation claim and Sixth Amendment right to counsel claim. The Court **FURTHER RECOMMENDS** that the District Court **DENY** the Motions with regard to: Helen and David Kincheloe's Fourth Amendment claim against Chief Caudle and the City of Bertram; William Bell's unlawful search and seizure claims against Chief Caudle and the City; Plaintiffs Helen and David Kincheloe, William Bell, David Thomas, Melinda Copeland, and Kristen Bergeson's First Amendment claims against Mayor Stephens and the City. The Court finds that Plaintiffs have presented sufficient summary judgment evidence to create a fact issue with regard to the these claims.

## V. WARNINGS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are

being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within ten (10) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53, 106 S. Ct. 466, 472-74 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically pursuant to the CM/ECF procedures of this District, the Clerk is directed to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 16th day of October, 2009.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE